UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PAUL FAIRLESS,

                Plaintiff,

    v.

THOMAS W. HARKER,[1]

                Defendant.

CASE NO. 3:19-cv-05747-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: April 9, 2021

The District Court has referred this matter to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and local Magistrate Judge Rules 1, 3, and 4.  Pending before the Court is defendant's motion for partial summary judgment.  Dkt. 22.

Plaintiff, a military veteran and employee of the Department of the Navy at the Puget Sound Naval Shipyard in Bremerton, Washington, brings a lawsuit related to alleged harassment he suffered in 2017 at the hands of a supervisor, David Nichols, whom plaintiff asserts harbored

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Thomas W. Harker, Acting Secretary of the Navy, as the appropriate defendant. *See* Dkt. 28, at 1 n.1.

animus toward him, sought to force plaintiff out of his job, and instigated a false investigation into plaintiff, leading to his demotion.  Plaintiff was eventually reinstated.  Part of this lawsuit is plaintiff's allegation that on some occasions, Nichols took actions against plaintiff based on his disabled status, and plaintiff's corresponding claim for unlawful harassment/hostile work environment on the basis of disability.  Solely that claim is the subject of this partial summary judgment motion.

Plaintiff has provided sufficient evidence to corroborate his claim that Nichols harbored personal animus toward plaintiff and made a concerted effort to have plaintiff fired.  But, claims of disability discrimination require something more:  animus *based on plaintiff's disabled status*. Here, plaintiff expressly disavows that he felt harassed based on his disability regarding most of the actions at issue and has come forward with evidence to support that only a handful of Nichols' actions and statements were based on such impermissible animus.  Specifically, plaintiff asserts that Nichols called plaintiff's home and hospital in April 2017 to uncover whether plaintiff was truly hospitalized and made remarks questioning the validity of plaintiff's handicapped status during the course of an investigation into plaintiff's timekeeping in September 2017.  These actions and statements fail as a matter of law to amount to the conditions necessary to show a hostile work environment for a claim of disability discrimination. Therefore, the partial summary judgment motion should be granted.

## BACKGROUND

### I. Allegations of the Amended Complaint

Plaintiff filed this matter in August 2019.  *See* Dkt. 1.  In the operative complaint, plaintiff alleges that he is a disabled veteran who is a qualified individual with a disability under the Rehabilitation Act of 1973 ("RA").  Dkt. 3, at 2.  Plaintiff asserts that throughout 2017, when

1   he was working as a Zone Manager for the Aircraft Launch and Recovery Equipment ("ALRE")

2   team at Puget Sound Naval Shipyard in Bremerton, Washington, Nichols engaged in a campaign

3   of harassment against him.  *See* Dkt. 3, at 2.  According to plaintiff, Nichols actively sought to

4   have plaintiff removed from his employment position.  Dkt. 3, at 3.  These efforts allegedly

5   culminated in Nichols instigating investigations into plaintiff for falsifying time records, among

6   other things.  Dkt. 3, at 3.  Plaintiff asserts that although he was innocent of the charges, Nichols

7   then falsely stated that plaintiff was guilty, recommended plaintiff's demotion, and altered a

8   prior favorable evaluation by plaintiff's supervisor to include the allegations in support of

9   removal—all leading to plaintiff's demotion.  *See* Dkt. 3, at 6–7.

10      Based on these allegations, plaintiff brings two claims:  (1) disability harassment/hostile

11  work environment under the RA and (2) retaliation under the RA and Title VII of the Civil

12  Rights Act of 1964.  *See* Dkt. 3.  Plaintiff seeks damages and injunctive relief.  Dkt. 3, at 13.

13      **II.  Partial Summary Judgment Motion and Materials in Support**

14      In January 2021, defendant moved for summary judgment dismissal of plaintiff's first

15  claim (for disability harassment/hostile work environment under the RA).  Dkt. 22.  Defendant

16  argues that plaintiff cannot show that alleged harassment was based upon his disability or was

17  sufficiently severe to create a hostile work environment.  Dkt. 22, at 4.

18      Defendants provide Nichols' declaration about events.  Nichols asserts that he was

19  plaintiff's first level supervisor at all relevant times and denies ever saying anything to the effect

20  of plaintiff "did not look disabled."  Dkt. 26, at 1–2.  Nichols' declaration is silent regarding

21  events in April 2017 (despite plaintiff's allegation that Nichols made harassing calls to plaintiff's

22  home and the hospital where plaintiff was hospitalized).  Dkt. 26, at 1.

23

24

1    Nichols acknowledges a conversation with plaintiff in early 2017, when they discussed a

2    new appraisal program.  Dkt. 26, at 3.  Although plaintiff alleges that Nichols disparaged

3    whether veterans deserved preference under the system, Nichols states that he merely explained

4    "that the appraisal program was based solely on performance and merit" and not "veterans[']

5    preference."  Dkt. 26, at 3.  Nichols claims that he did not "get the impression . . . that [plaintiff]

6    was offended by the discussion."  Dkt. 26, at 3.

7    Nichols also acknowledges a conversation with plaintiff in 2017, when plaintiff alleges

8    that Nichols bragged about getting an employee fired.  Nichols claims that this conversation

9    occurred in May 2017 and that he merely "shared an experience" about how to deal with a

10    difficult employee.  *See* Dkt. 26, at 2–3.

11    According to Nichols, in June 2017, an employee claimed that plaintiff had subjected her

12    to inappropriate behavior and in August 2017, "an issue arose" that some of the employees under

13    plaintiff's supervision were certifying time improperly.  Dkt. 26, at 1.  Nichols and another

14    reviewed plaintiff's time and attendance records as part of the ensuing investigation.  Dkt. 26, at

15    2.  They asked plaintiff "how he got to work on days where there were no badge swipe records

16    that showed he walked in through a turnstile," and plaintiff showed his handicapped access bus

17    pass, explaining that the "Access bus does not scan badges upon entry to the Shipyard."  Dkt. 26,

18    at 2.  Nichols claims that "[t]his was the first time I can recall knowing that he had a disability."

19    Dkt. 26, at 2.  In Nichols' version of this interaction, plaintiff presented his Access bus pass

20    without any prompting from Nichols.  Dkt. 26, at 2.

21    Plaintiff's second level supervisor at the time, Milan Anderson, also provides his

22    declaration stating that he prepared a notice of proposed removal proposing plaintiff's removal in

23    November 2017.  Dkt. 25, at 2.  The notice of proposed removal cites plaintiff's alleged

24

inappropriate conduct toward a female employee and toward other subordinates, abuse of authority by directing employees to drive him in a government vehicle, request for other employees to enter his work hours, failure to follow Nichols' directives, and denial of allegations against him. *See* Dkt. 25, at 4–6. Another person, Mark Heistand, demoted plaintiff in January 2018. Dkt. 25, at 14.

### III. Response to Partial Summary Judgment Motion

In response to the partial summary judgment motion, plaintiff relies on his deposition testimony and other evidence. Plaintiff testifies that he has physical and mental disabilities and that he was authorized to use the handicapped access van to enter work. Dkt. 23-1, at 4–8. Plaintiff acknowledges that he was demoted but explains that after seven months, he was reinstated. Dkt. 23-1, at 12. And plaintiff asserts that Nichols was plaintiff's direct supervisor only from approximately summer 2017 to October 2017. *See* Dkt. 23-1, at 13–14.

According to plaintiff, in April 2017, Nichols called plaintiff's home on five separate occasions, speaking with plaintiff's family or leaving voicemail messages, seeking a report on plaintiff's condition while plaintiff was hospitalized from major surgery. *See* Dkt. 23-1 at 27; Dkt. 27-1, at 19, 40. Plaintiff states that one of these calls left plaintiff's son in tears and that Nichols also called plaintiff's hospital twice. Dkt. 23-1, at 25, 28–29, 30–31. Plaintiff testified that a nurse stated that Nichols had been "very . . . direct" and "pushy" trying to get information about plaintiff, so that the hospital asked Nichols to set his status as private. Dkt. 23-1, at 31–32. Plaintiff later called a meeting with Nichols and his supervisors, where he confronted Nichols, who agreed to only call plaintiff's work phone in the future. Dkt. 23-1, at 34–36. Plaintiff points to another employee's statement that Nichols told her he was attempting to verify the validity of

1  plaintiff's claim he was badly injured as evidence that Nichols' actions in this regard were

2  motivated by discriminatory animus.  *See* Dkt. 27-1, at 9.

3         Plaintiff testified that subsequently, in May 2017, he had an argument with Nichols

4  regarding the veterans' point system, when plaintiff construed Nichols as being hostile toward

5  plaintiff because of his disability.  Dkt. 23-1, at 18–20; *see also* Dkt. 23-1, at 43.  Specifically,

6  plaintiff recounted Nichols' alleged statement that "[c]ombat veterans did not need their points

7  for retention."  Dkt. 23-1, at 19.

8         Plaintiff states that during the summer of 2017, three engineers told plaintiff that Nichols

9  was "out to get rid of [him]."  Dkt. 23-1, at 47.   However, plaintiff acknowledges that when he

10 confronted Nichols about these statements, Nichols said nothing that plaintiff construed as being

11 disability-based discrimination.  Dkt. 23-1, at 49.

12        And in June, plaintiff asserts that Nichols "bragged" about the investigation that had

13 begun into plaintiff.  Dkt. 23-1, at 50.  Plaintiff confronted Nichols about these incidents,

14 although plaintiff again testified that he did not think that these actions were disability motivated.

15 *See* Dkt. 23-1, at 49, 52–53.  Plaintiff also recalls the conversation with Nichols about Nichols

16 "running another employee out of the yard."  Dkt. 23-1, at 59.  According to plaintiff, Nichols

17 said that this occurred after the employee was injured, and plaintiff felt that the story conveyed

18 that Nichols was "trying to screw [plaintiff]."  Dkt. 23-1, at 60–61.

19        Subsequently, during the investigation into his time certification—which revealed no

20 discrepancies (Dkt. 27-1, at 16), according to plaintiff's evidence—plaintiff asserts that Nichols

21 asked plaintiff how he entered the yard.  Dkt. 23-1, at 9.  Plaintiff asserts that Nichols did not

22 believe plaintiff when he showed Nichols the "disabled card."  Dkt. 23-1, at 12; *see also* Dkt. 23-

23 1, at 57.  In support of these claims, plaintiff also provides a statement from an employee who

24

1    remembered Nichols having made a comment about plaintiff not deserving to ride the access bus

2    and seeming "kind of bitter that [plaintiff] had those benefits [sic]." Dkt. 27-1, at 5, 11.

3         Plaintiff asserts that later, the investigation against him concluded, yet Nichols stated that

4    he did not wish for plaintiff to continue to work in ALRE. Dkt. 23-1, at 68. Again, Nichols did

5    not say anything that led plaintiff to conclude this was because of plaintiff's disability. Dkt. 23-

6    1, at 53. Plaintiff asserts that on October 5, 2017, he complained to Anderson and another

7    person that he could not work under Nichols any longer and was reassigned to another

8    supervisor. Dkt. 23-1, at 14–15.

9         Although plaintiff listed each of the interactions above as incidents of alleged disability-

10   based discrimination, in his testimony, plaintiff explained that regarding most interactions, he

11   felt that Nichols' motivation was animus against plaintiff because he was a veteran—not because

12   of his medical conditions. Dkt. 23-1, at 27. Plaintiff repeatedly stated that his disabilities "came

13   into play" only once the investigation started, when Nichols challenged the validity of plaintiff's

14   handicapped card. Dkt. 23-1, at 26–27 ("So I would not tell you disability discrimination . . .

15   until the investigation started and they were going after me for time and they were saying I . . .

16   should not be riding a handicapped situation. Other than that, it was just harassment."); *see also*

17   Dkt. 23-1, at 48, 57. Plaintiff explained that he felt that Nichols was frustrated during this

18   conversation because he had conducted an extensive investigation with the goal of charging

19   plaintiff with falsely reporting time, only to be foiled by learning that plaintiff's handicapped

20   status allowed him to ride the access bus. Dkt. 23-1, at 58.

21

22                                     **DISCUSSION**

23   **I. Summary Judgment Legal Standard**

24

1    Summary judgment is appropriate if a moving party shows that "there is no genuine

2    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

3    R. Civ. P. 56(a). The materiality of a given fact is determined by the required elements of the

4    substantive law under which the claims are brought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5    242, 248 (1986). When presented with a motion for summary judgment, the court shall review

6    the pleadings and evidence in the light most favorable to the nonmoving party. *Anderson*, 477

7    U.S. at 255. Weighing of evidence and drawing legitimate inferences from facts are jury

8    functions and not the function of the court. *See United Steel Workers of Am. v. Phelps Dodge

9    Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989). If the material evidence is in genuine dispute, a

10   motion for summary judgment dismissal should be denied.

11   **II. Framework for Claims under the RA**

12   As a preliminary matter, much of the analysis herein involves cases arising under the

13   Americans with Disabilities Act (generally applicable to state and local government entities that

14   do not receive federal funds), rather than the RA (generally applicable to programs receiving

15   federal funds). This is because it is well-settled that "there is no significant difference in the

16   analysis of rights and obligations created by the two Acts." *Vinson v. Thomas*, 288 F.3d 1145,

17   1152 n.7 (9th Cir. 2002); *see also* 42 U.S.C. § 12133 (a portion of the ADA, stating that "[t]he

18   remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies,

19   procedures, and rights [applicable to ADA claims]"); *Bragdon v. Abbott*, 524 U.S. 624, 632

20   (1998) (stating that courts are required to "construe the ADA to grant at least as much protection

21   as provided by the regulations implementing the Rehabilitation Act").

22   Neither the Ninth Circuit nor the Supreme Court has expressly held that there is a claim

23   for a hostile work environment or for harassment based on disability discrimination under the

24

ADA.  Nonetheless, the Ninth Circuit has assumed without deciding that such a claim exists.

*E.g.*, *Denning v. Cty. of Washoe*, 799 F. App'x 547 (9th Cir. 2020)[2]; *Meirhofer v. Smith's Food & Drug Centers Inc.*, 415 F. App'x 806, 807 (9th Cir. 2011).  And several other circuits have also recognized a hostile work environment claim as an actionable ADA claim because of the similarity between the language of the ADA and Title VII.  *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001).  District courts within the Ninth Circuit address ADA hostile work environment claims on the merits and apply the same Title VII standard. *See, e.g.*, *Betti v. Kaiser Found. Health Plan, Inc.*, No. CIV-S-03-2678DFLDAD, 2006 WL 355148, at *5 (E.D. Cal. Feb. 15, 2006) (finding on the merits that the plaintiff "does not make out a specific claim of hostile work environment under the ADA"); *Rood v. Umatilla Cty.*, 526 F. Supp. 2d 1164, 1177 (D. Or. 2007) (finding that "there is at least a question of fact whether plaintiff suffered conduct unwelcome, abusive, and pervasive enough to create a hostile work environment" under the ADA).  Finally, defendant does not request dismissal of plaintiff's claim on the basis that there is no such cause of action under the RA.  Instead, defendant argues that even assuming such a cause of action exists, plaintiff has failed to provide evidence from which a trier of fact could find in his favor on such a claim.

Assuming there is an identical RA claim for disability harassment as other circuits have recognized under the ADA, plaintiff must show, among other factors, that he was subjected to harassment that was based on his disabilities. *See Flowers*, 247 F.3d at 236–37.  A hostile work environment claim requires more than simply showing mistreatment on the basis of disability.

---

[2] Although not binding precedent, unpublished decisions have persuasive value and may be relied on.  *See* Ninth Cir. R. 36-3 ("Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007.").

1    *See Vasquez v. Cty. of L.A.*, 349 F.3d 634, 643 (9th Cir. 2003), *cited in Denning*, 799 Fed. App'x

2    at 547.  A plaintiff must therefore also show, among other elements, that harassment was

3    sufficiently pervasive or severe to affect a term, condition, or privilege of his employment.  *See*

4    *Flowers*, 247 F.3d at 236–237 (citations omitted). "Moreover, the disability-based harassment

5    must 'be sufficiently pervasive or severe to alter the conditions of employment and create an

6    abusive working environment.'"  *Id.* at 237 (citations omitted).

7    **III.  Analysis of the Parties' Arguments**

8         Defendant argues that plaintiff cannot show two elements required by courts for a hostile

9    work environment claim under the ADA—that alleged harassment was based upon plaintiff's

10   disability and that it was sufficiently severe or pervasive as to alter the conditions of his

11   employment and create an abusive work environment.  Dkt. 22, at 11.  Plaintiff's briefing

12   focuses on what he asserts are "really two incidents in this case [that] can be said to be disability

13   related harassment": the calls Nichols allegedly made in April 2017 when plaintiff was

14   hospitalized and Nichols' accusations about plaintiff's use of the handicap access bus and

15   handicap card.  Dkt. 27, at 9.

16        Plaintiff has come forward with ample evidence to support his overall claim that Nichols

17   embarked on a campaign to have plaintiff removed from his position based on animus against

18   plaintiff.  However, a requirement for a hostile work environment claim is that plaintiff show

19   that actions were motivated by animus based on disability.  *See, e.g.*, *Flowers*, 247 F.3d at 236–

20   37.  Here, for most actions, plaintiff has come forward with evidence that animus against

21   veterans or personal animus against plaintiff motivated Nichols—but plaintiff has failed to come

22   forward with evidence that animus *against disabilities* motivated Nichols.

23

24

1    For instance, and as set forth above, plaintiff testified that he construed Nichols' hostility

2  about the veteran's preference system as disability discrimination toward plaintiff based entirely

3  on Nichols' alleged statement that "[c]ombat veterans did not need their points for retention."

4  Dkt. 23-1, at 19.  But this statement evinced hostility toward veterans, and if taken as true,

5  supports plaintiff's overall claim that Nichols "has an issue with vets"—but not his claim of

6  disability discrimination.  *See* Dkt. 23-1, at 25.  In later incidents, plaintiff allegedly learned that

7  Nichols was "out to get rid of" him (Dkt. 23-1, at 47) and heard Nichols brag about instigating

8  the investigation into plaintiff (Dkt. 23-1, at 50), and state after the investigation had concluded

9  that Nichols did not wish for plaintiff to continue to work in ALRE.  Dkt. 23-1, at 68.  But

10  regarding each of these later incidents, plaintiff testified that he did not interpret or understand

11  these comments to be disability motivated.  Dkt. 23-1, at 49, 53.  Again, plaintiff himself

12  acknowledged that he did not feel that most of the incidents at issue in this case were based on

13  plaintiff's disability and argues in the summary judgment motion that only the phone calls and

14  the comments about his handicapped card during the investigation were disability-motivated.

15    Even taking the evidence in the light most favorable to plaintiff, therefore, only three

16  groups of incidents are actionable as disability discrimination—phone calls about plaintiff's

17  medical issues, the story about Nichols working to terminate an injured worker, and the inquiry

18  about the validity of plaintiff's handicapped identification card.  *See also* Dkt. 27, at 9

19  (conceding that the only disability-related incidents are the phone calls and questioning about the

20  identification card).  The Court turns to whether these actions, viewed together, could amount to

21  a hostile work environment as a matter of law.

22    As noted above, plaintiff states that Nichols called plaintiff's home on five separate

23  occasions in April 2017, speaking with plaintiff's family (and leaving his young son in tears on

24

1    one occasion) or leaving voicemail messages, seeking a report on plaintiff's condition while

2    plaintiff was hospitalized from major surgery.  *See* Dkt. 27-1, at 19, 40.  According to plaintiff,

3    hospital staff reported that Nichols called twice and was "very . . . direct" and "pushy" trying to

4    get information about plaintiff, so that the hospital asked Nichols to set his status as private.  Dkt.

5    23-1, at 31–32.  After plaintiff confronted Nichols, he did not again use a number other than

6    plaintiff's work phone to contact him.  Dkt. 23-1, at 34–36.  An employee who worked with

7    Nichols states that Nichols told her he was attempting to verify whether plaintiff was really

8    injured.  *See* Dkt. 27-1, at 9.

9         Due to the disputed conversation regarding Nichols' role in terminating an injured

10   employee, plaintiff claims that he felt that Nichols was trying to "screw" plaintiff.  Dkt. 23-1, at

11   60.  And plaintiff asserts that it was improper for Nichols to challenge the validity of plaintiff's

12   handicapped identification card during the subsequent investigation into plaintiff's time

13   certification.  *See* Dkt. 23-1, at 12; *see also* Dkt. 27-1, at 5, 11 (another employee's declaration

14   that Nichols seemed "kind of bitter that [plaintiff] had those benefits [sic].").  Dkt. 27-1, at 5, 11.

15   Plaintiff asserts that Nichols challenged whether plaintiff's name was "even on" his handicapped

16   identification card—

17        He [Nichols] told me [plaintiff] that, you know, "Are you even handicapped?  Is
          this your name on that blue card?"
18        . . . .
          . . . he gets into the time when I proved [sic] and I showed some documents and he
19        was very frustrated that he worked on a lot of stuff and it did not work in his favor.
          I'll say his dates did not match mine, because I was properly saying I was in the
20        yard and he had me not in the yard until 9:00. . . .

21   Dkt. 23-1, at 57–58; *see also* Dkt. 23-1, at 63.

22        In determining whether a work environment is abusive, a court must consider the entirety

23   of the evidence presented, including the frequency of the discriminatory conduct, its severity,

24

1    whether it was physically threatening or humiliating, or a mere offensive utterance, and whether

2    it unreasonably interferes with an employee's work performance." *Flowers*, 247 F.3d at 237.

3    Here, plaintiff alleges seven phone calls, a conversation, and comments during an investigation

4    over the course of approximately half a year.

5        Plaintiff does not state that he felt physically threatened or humiliated by these incidents,

6    instead claiming that he was very irritated, "pretty upset," "frustrat[ed]," and felt like Nichols

7    was "trying to screw [him]." Dkt. 23-1, at 32, 61, 63–64. Notably, plaintiff acknowledges that

8    after he complained about Nichols calling plaintiff's hospital and home, Nichols ceased doing so.

9    Dkt. 23-1, at 34–36. And plaintiff does not allege that Nichols' actions in these regards

10   interfered with his work performance.

11       Regarding the severity of these actions, the Court notes that persuasive authority from

12   this Circuit shows that in even more egregious situations than that presented here, a hostile work

13   environment claim has not been supported. *See Denning*, 799 F. App'x at 547 (9th Cir. 2020)

14   (affirmed dismissal of a hostile work environment claim under the ADA where supervisor "made

15   two derogatory statements about [plaintiff's] disability over a three-year period, told her co-

16   workers that she was a 'problem child' and a 'trouble-maker,' assigned her longer shifts and less

17   desirable tasks, and 'subjected [her] to excessive scrutiny'"); *Garcia v. Qwest Corp.*, No. CV07-

18   999-PHX-LOA, 2008 WL 5114317, at *14 (D. Ariz. Dec. 4, 2008) (dismissing hostile work

19   environment claim premised on comments that plaintiff was "fu–king the company," did not

20   have a disability, and was "just a little girl."). The Ninth Circuit has sustained dismissal of a

21   hostile work environment claim where the plaintiff provided specific factual allegations about a

22   few incidents spread over the course of a year. *See Vasquez*, 349 F.3d at 644 (supervisor's two

23   racially derogatory statements over six months, yelling at subordinate, and writing memos about

24

1  the subordinate over a year were not adequate).  Relevant to plaintiff's claim that Nichols told a

2  story implying he had a disabled employee fired, in *Kortan v. California Youth Authority*, the

3  Ninth Circuit held that a female worker had not shown a hostile work environment where, among

4  other things, a supervisor referred to *other women* using derogatory epithets and names.  217

5  F.3d 1104, 1106–07 (2000).  And even inappropriate phone calls made directly to a plaintiff have

6  not amounted to a hostile work environment, where the phone calls were an isolated group of

7  incidents.  *See Hawkins v. Vail Sch. Dist. #20*, No. CV 09-393-TUC-RCC, 2011 WL 13301687,

8  at *1 (D. Ariz. Mar. 16, 2011) (two sexually explicit phone calls and a text message inadequate

9  to amount to a hostile work environment).

10      Conversely, in cases where the Ninth Circuit has concluded that there is a viable hostile

11  work environment claim based on actions that are not, standing alone, extremely severe, the

12  Court has required a pattern of incidents that permeates the employment.  *E.g.*, *Davis v. Team

13  Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008) (viable Title VII claim where female electrician

14  repeatedly experienced sexist comments and was shunned from attending meetings that her male

15  coworkers attended over the course of her employment); *Nichols v. Azteca Rest. Enterprises,

16  Inc.*, 256 F.3d 864, 872–73 (9th Cir. 2001) (holding that under Title VII, unrelenting barrage of

17  verbal abuse on the basis of sex, including a "sustained campaign of taunts" at least once a week,

18  amounted to conditions sufficiently severe and pervasive to alter terms and conditions of

19  employment); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105–06, 1109 (9th Cir. 1998)

20  (allowing claim under Title VII premised on supervisor's two year campaign of sexual remarks,

21  including mocking plaintiff in front of a supervisor when she complained of harassment).

22      Here, taking plaintiff's evidence as true, he essentially sets forth that in April and

23  September 2017, Nichols called or questioned plaintiff in an effort to uncover that plaintiff was

24

REPORT AND RECOMMENDATION - 14

1   "faking" his medical conditions and disabilities and that sometime in between, Nichols told a

2   story implying he had had an injured worker fired.  Although plaintiff relies on these incidents as

3   supporting his claim of a hostile work environment, plaintiff does not point to any case law

4   supporting his argument that such efforts to uncover a false medical condition amount to a

5   hostile work environment.  In fact, the cases that the undersigned has found support that

6   scattered incidents questioning the validity of plaintiff's disability do not amount to a hostile

7   work environment.  *See Ford v. Marion Cty. Sheriff's Off.*, 942 F.3d 839, 856–57 (7th Cir. 2019)

8   (two incidents in which plaintiff was told she needed to prove her disability and questioned

9   whether she was actually in pain were not, as a matter of law, enough to support claim of hostile

10  work environment); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 45 (1st Cir. 2011)

11  (statements from coworkers that plaintiff was "faking it" and calling her a hypochondriac, among

12  other actions, inadequate).  *But see Duryea v. MetroCast Cablevision of N.H., LLC*, No. 15-CV-

13  164-LM, 2017 WL 1450219, at *7 (D.N.H. Apr. 21, 2017) (triable issues of fact regarding

14  whether five-year employment in which disabled employee was subjected to repeated

15  disparaging comments and treatment due to her disability, including an incident in which her

16  supervisor humiliated her by forcing her to clean up a spill even though she was confined to a

17  wheelchair).  The Court disagrees with plaintiff that he has shown that the disability-related

18  incidents at issue were sufficiently pervasive or severe to alter the conditions of employment and

19  create an abusive working environment.

20          As plaintiff acknowledges, taking his evidence as true, this case may reflect an

21  inappropriate campaign waged against plaintiff by a supervisor on the basis of personal animus

22  or animus toward veterans.  However, it is not personal animus, but actions motivated by

23  disability-based prejudice, that can properly support a claim of disability discrimination.  *Accord*

24

1    *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) ("To prevail on

2    a hostile work environment sexual harassment claim [under Title VII], the plaintiff must show

3    that her work environment was both subjectively and objectively hostile; that is, she must show

4    that she perceived her work environment to be hostile. . . .").  The handful of actions related to

5    plaintiff's disability fail as a matter of law to amount to actions creating a hostile work

6    environment, even taking plaintiff's evidence as true.  Therefore, the partial summary judgment

7    motion should be granted.

8                                          **CONCLUSION**

9           The partial summary judgment motion (Dkt. 22) should be granted, and plaintiff's claim

10   of disability discrimination/hostile work environment under the Rehabilitation Act should be

11   dismissed with prejudice.

12          Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

13   fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

14   6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

15   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

16   of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

17   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

18   imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 9, 2021,**

19   as noted in the caption.

20          Dated this 22nd day of March, 2021.

21

22

23                                               J. Richard Creatura
                                                 United States Magistrate Judge
24